I respectfully dissent from the majority's decision in this case. Because the results obtained from the breath test administered to Papandreas are not reliable according to the standards promulgated by the Ohio Department of Health, I do not believe they should be admissible in evidence against him. I also do not believe we should substitute our judgment of adequate testing procedures for that of the Department of Health. Because this decision effectively negates the Department's authority, I must respectfully dissent.
My first point of disagreement with the majority is that it sanctions the admission of breath test results, the accuracy and reliability of which the Ohio Department of Health states are "questionable." R.C. 4511.19 (D)(1) provides that any bodily substance collected for the purpose of determining whether a person was operating a motor vehicle while under the influence of alcohol or with a prohibited concentration of alcohol in the breath "shall be analyzed in accordance with methods approved by the director of health." Section 3701-53-02 (B) of the Ohio Administrate Code requires breath samples of deep lung or alveolar air to be analyzed according to the operating checklist for the instrument being used as set forth in the applicable Appendix. Appendix D to Section 3701-53-02 requires an officer administering the BAC Datamaster test to "[o]bserve subject for twenty minutes prior to testing to prevent oral intake of any material."
The reason for waiting twenty minutes before testing the subject is to eliminate the possibility that the test result is a product of anything other than the suspect's deep lung breath. See State v. Steele (1977), 52 Ohio St.2d 187. Because the accuracy of the test results can be adversely affected if the suspect either ingests material orally, like food or drink, or regurgitates material internally, by belching or vomiting, the suspect must be observed for twenty minutes to verify that no external or internal material may cause a false reading. The twenty-minute observation period, therefore, ensures that the test results will fairly reflect the measure of alcohol in the suspect's deep lung breath. State v. Steele, supra.
In this case, the testing officer observed Papandreas from 6:54 a.m. until the first complete breath sample taken at 7:15 a.m. produced the error code, "Invalid Sample." The testing officer had Papandreas provide a second complete breath sample five minutes later at 7:20 a.m. The majority holds that the results obtained from the second test are nevertheless admissible. I cannot agree.
Craig A. Sutheimer, a Deputy Director for the Department of Health for the State of Ohio and the Chief of that department's Bureau of Alcohol and Drug Testing, testified that when a breath test produces "invalid sample" as a result, that result should be treated as if there were mouth alcohol present and another breath sample should not be taken until a second twenty-minute observation period has been completed so that mouth alcohol can be ruled out as a cause for the first result. Dr. Sutheimer testified that if the retesting occurred before the second twenty-minute observation period had elapsed, "[t]he accuracy and the reliability is now questionable." (Tr. 40.)
The majority concludes that it was unnecessary to wait twenty minutes before re-testing Papandreas, because the officer already observed him for twenty minutes before the first test was administered and Papandreas did not put anything into his mouth. The majority apparently believes that so long as suspects do not put anything into their mouths during the observation period, the initial twenty-minute observation period eliminated any possibility that mouth alcohol affected the second test result. This conclusion mistakenly assumes that only external substances ingested orally can affect the accuracy of the test. As the court recognized in State v. Steele, supra, a false reading may occur as a result of either external or internal material. Accordingly, the fact that Papandreas did not ingest anything orally did not ensure that the result obtained from the second test was accurate and was not affected by internal material such as "mouth alcohol" that could distort the reading.
Dr. Sutheimer explained, moreover, why the first observation period does not assure that the second test accurately reflects the suspect's deep lung breath:
 Q. So assuming that the 20-minute observation period had been observed and the test was given and it came back invalid sample, would it not be appropriate for us to assume that mouth alcohol was, in fact, not present?
 A. It is possible that it's not there. The easiest way of determining that it's not there again is to assume it is and re-test. of all the possibilities, it's the one that is most easily involved. If it's truly mouth alcohol, if that was the reason for the invalid, then with the next one you should be able to produce a valid test, the next —
 Q. I understand that. But if the observation period has been observed, three to five minutes should be enough, with no further ingestion of alcohol, why can't we eliminate that as being part of the problem in getting an invalid sample?
 A. We don't know if it wasn't part of it. Again, it is possible obviously — intake is simple enough to fix. The 20-minute observation period is going to prevent that totally. But the belching and burping and things like that can be done in such a way that it — and, again, people are scared during this period of time. People who are scared probably have more of a chance of having very minor belches than anyone else, so it — as I said, the reason for thinking about it is that's a solvable issue. That's something that we can rule out very quickly. The other ones are very, very difficult to rule out and may not be able to be ruled out at all.
 Q. Okay. So to put a bottom line on it, if a test comes back invalid sample, it may or may not be as a result of the presence of mouth alcohol?
A. Yes.
(Tr. 49-50.)
One month after Dr. Sutheimer testified but while this case was still pending in the court below, the Bureau of Alcohol and Drug Testing promulgated to all BAC Datamaster and BAC Verifier sites its written policy relating to "invalid samples." The department's December 14, 1998 policy, which Papandreas submitted for the trial court's consideration, states:
 Effective immediately an "invalid sample" indication on the BAC Verifier or BAC Datamaster is to be handled by initiating a new 20 minute observation period. The reason for this change is due to the fact that "invalid sample" may be caused by different things. The operator will no longer have to decide exactly what may have caused the "invalid sample," the remedy will always be a new observation period.
The majority notes that the health department's written policy at the time Papandreas was tested did not require the testing officer to wait twenty minutes before re-testing and that the written policy did not become effective until after Papandreas was tested. But the issue here is not merely whether the testing officer followed the regulations in force at the time. The issue is whether the results from a procedure that is now recognized as deficient by scientific standards are admissible.
Nor is it useful to wonder whether the health department adopted its policy out of an "abundance of caution," as the majority speculates. It is not a caution; it is a necessary condition — the "bottom line." The health department has concluded that failing to wait twenty minutes between tests does not meet scientific standards and, therefore, the results are not reliable. If such results are not reliable after the policy became effective, I do not understand how they can be reliable before the policy became effective.
For that matter, there is not even a question of "strict compliance" or "substantial compliance," as the majority suggests. I have no disagreement with admitting a test result when the procedure by which the result was obtained was in at least substantial compliance with the applicable regulations and any deviation from the regulations did not compromise the integrity of the test results. See, e.g., Bolivar v. Dick (1996),76 Ohio St.3d 216 (substantial compliance with twenty-minute observation period when two or more officers, one of whom is certified operator of BAC Verifier, observe suspect continuously for twenty minutes or more); State v. Steele, supra (substantial compliance with twenty-minute observation period even though arresting officer averted gaze for a few seconds while exiting patrol car). I doubt that failing to wait at least twenty minutes would satisfy even the relaxed standard of "substantial compliance" because the failure to meet the bare minimum compromises the integrity of the test and its results. Because failing to wait twenty minutes before re-testing Papandreas undermines the integrity of the test, this test could not satisfy even "substantial compliance."
The majority says it does not question the wisdom of the department's policy and insists that this decision does not render the health department's December 14, 1998 written policy a "dead letter." It is unclear whether the majority would sanction the admission of these test results had the department's written policy been in force when Papandreas was tested. If the majority would say the results would not be admissible after the policy was in force, I cannot see why they would admit the same test results before the written policy was in force. But given the majority's criticism of the department's regulation, however, there is little reason to think the majority would exclude these test results even after the policy was in force. This case will therefore stand as authority for the proposition that the failure to observe a suspect for twenty minutes before re-testing after an "invalid sample" reading does not render the test results inadmissible. By this decision, a test result obtained five minutes after an "invalid sample" reading will be considered "substantial compliance." The majority may say the regulation is not dead, but I cannot feel any pulse.
In a larger sense, I believe the majority's decision undermines the Department of Health's authority to respond to improvements in scientific research in order to establish accurate and reliable testing procedures. "The accuracy of the test results is a critical issue in determining a defendant's guilt or innocence." Defiance v. Kretz (1991), 60 Ohio St.3d 1, 3. The accuracy of the test results depends on the techniques or methods used to obtain the results. R.C. 3701.143 "clearly vests all authority relative to determining the techniques and methods of chemically analyzing the alcohol content in a person's blood, urine and breath for purposes of R.C. 4511.19, in the director of health." State v. Melms (1999), 131 Ohio App.3d 246, 250.
I do not believe we should substitute our judgment and accept as reliable a test the Ohio Department of Health no longer accepts as reliable. The Rules of Evidence demand that the court act as a gatekeeper to ensure that any and all scientific testimony or evidence be both relevant and reliable. See Daubertv. Merrell Dow Pharmaceuticals, Inc. (1993), 509 U.S. 579, 589. Because the test results obtained from Papandreas were not obtained in accordance with the techniques and methods approved by the Department of Health as reliable, those results should not be admissible. Therefore, I would reverse the judgment of the trial court.